IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:23-CT-3047-FL

| | | |
|---|---|---|
| SAMUEL CLEMENT WENDT,<br><br>Plaintiff,<br><br>v.<br><br>JAMIE BULLARD, RAYMOND BAILEY, MARCUS HOVIS, GEORGE BAYSDEN, and KIMBERLY GRANDE,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | ORDER |

This matter is before the court on the parties' cross motions for summary judgment (DE 108, 116) and defendants' unopposed motion to seal (DE 132). The motions for summary judgment have been briefed fully and in this posture the issues raised are ripe for ruling.

**STATEMENT OF THE CASE**

Plaintiff, a state inmate initially proceeding pro se,[1] commenced this action by filing complaint February 15, 2023, alongside several other inmates acting as a purported class. The court denied class certification and required plaintiffs to proceed with individual amended complaints. Plaintiff filed the operative amended complaint June 8, 2023, alleging constitutional violations against defendants in their individual and official capacities under 28 U.S.C. § 1983, and seeking money damages, as well as injunctive and declaratory relief. Defendants Jamie Bullard ("Bullard"), Raymond Bailey ("Bailey"), Marcus Hovis ("Hovis"), George Baysden

[1] Prior to conclusion of discovery, plaintiff obtained counsel. The court expresses its gratitude to plaintiff's counsel for undertaking this representation.

("Baysden"), and Kimberly Grande ("Grande") (collectively, "defendants") were correctional officials employed by the North Carolina Department of Adult Correction ("DAC") during the relevant period.

Plaintiff's remaining claims against defendants assert violations of the Free Exercise, Establishment, and Equal Protection Clauses under the First and Fourteenth Amendments to the United States Constitution. Plaintiff generally alleges defendants violated his constitutional rights through enforcement of three restrictions: 1) disallowing congregate religious services for more than two years in response to the COVID-19 pandemic, while permitting other secular activities to resume; 2) denying plaintiff's requests to become an offender faith helper; and 3) prohibiting plaintiff's weekly participation in congregate religious services once they resumed because of his housing status.

Following a period of discovery, and in accordance with the court's case management order, defendants filed the instant motion for summary judgment. Defendants argue they are entitled to judgment as a matter of law, that plaintiff cannot show a triable issue of fact on any of his First or Fourteenth Amendment claims, and that defendants are all entitled to qualified immunity. In support, defendants rely on memorandum of law, statement of material facts, and appendix of exhibits including: 1) declarations of counsel and defendants; 2) plaintiff's custody and control history; 3) DAC policies; 4) defendant Bailey's deposition transcript; 5) plaintiff's incarceration summary and medical records; 6) educational course agreement; and 7) December 2020 news articles.

Plaintiff responded in opposition. Plaintiff argues that defendants are not entitled to summary judgment or qualified immunity on any of his claims. In support, plaintiff relies on a

memorandum of law, opposing statement of facts, and appendix of exhibits including: 1) declaration of Travis Pagan, an inmate at Piedmont Correctional Institution ("Piedmont CI"); 2) an answer and declaration from a separate lawsuit brought by plaintiff, Wendt v. Anderson, 1:25-CV-16-TDS-JGM; 3) DAC policies; and 4) plaintiff's exhibits to his motion for summary judgment.

By separate motion for summary judgment, plaintiff argues that he is entitled to judgment as a matter of law, that defendants cannot show a triable issue of fact on any of his claims, and that defendants are not entitled to qualified immunity. In support of his motion, plaintiff relies on memorandum of law, statement of material facts, and appendix of exhibits including: 1) plaintiff's declaration; 2) the Catechism of the Catholic Church and Code of Canon Law; 3) party filings; 4) defendants' discovery responses; 5) DAC policies; 6) DAC's implemented actions on COVID-19; 7) declaration of and correspondence from Mike Vandiver; 8) DAC records; and 9) DAC's August 12, 2024, settlement agreement with the United States concerning protection of certain rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA Settlement").

Defendants responded in opposition, arguing that plaintiff's motion fails to create a genuine issue of material fact and does not refute defendants' own arguments for summary judgment. Defendants also contend plaintiff's motion and supporting memorandum raise new claims and allegations that should not be considered on summary judgment. In support, defendants rely on a memorandum of law and response in opposition to plaintiff's fact statement. Plaintiff replied.

## STATEMENT OF FACTS

Plaintiff was an inmate at Tabor Correctional Institution ("Tabor CI") from October 2020 until March 2023. (Pl's App. Ex. 1 (DE 119-1) at 6, 27).[2] Prior to plaintiff's incarceration through the present, plaintiff was and remains a practicing Roman Catholic. (See DE 119-1 at 2). Plaintiff believes that his Roman Catholic faith requires him to attend Mass with other Roman Catholics on Sundays and Holy Days, receive the Eucharist at least once per year, and participate in the sacrament of reconciliation at least once per year. (Id. at 2-5). According to plaintiff, "[t]he precepts of the Church concerning Mass, Eucharist and Penance are binding under pain of mortal sin." (Id. at 5). Thus, failure to adhere to these precepts would "violate [plaintiff's] conscious and place [his] soul in mortal jeopardy." (Id.).

Defendants' roles as they pertain to the claims in this case are summarized as follows. Defendant Bullard served as an associate warden of custody, acting warden, interim warden, and warden at Tabor CI between January 2021 and March 2023. (Defs' Mem. Ex. 2 (DE 111-17) at 1). Defendant Bullard was "ultimately responsible for all local policies developed and enforced at [Tabor CI]" between November 25, 2021, and March 16, 2023. (Plf's Mem. Ex. 8 (DE 119-8) at 14).

Defendant Bailey was programs director at Tabor CI between March 2020 and March 2023 and associate warden of programs and chaplain between March 2022 and January 2023. (Defs' Mem. Ex. 5 (DE 111-20) at 1). As associate warden of programs, defendant Bailey directly supervised religious services at Tabor CI. (DE 119-8) at 10).

---

[2] Throughout this order, page numbers in citations to record documents are to the page number specified in the footer of the document supplied by the court's case management / electronic case filing (CM/ECF) system for the docket entry (DE) and not the page number, if any, showing on the face of the underlying document.

Defendant Hovis was chaplain at Tabor CI between March 2020 and June 30, 2022. (Defs' Mem. Ex. 4 (DE 111-19) at 1). As chaplain, Defendant Hovis was responsible for providing "moral, spiritual and pastoral care, and ministerial services to offenders at Tabor CI," including coordinating and supervising religious services. (Plf's Mem. Ex. 17 (DE 119-17) at 2).

Defendant Baysden served as an associate warden at Tabor CI between March 2020 and March 10, 2022. (Defs' Mem. Ex. 3 (DE 111-18) at 1). Defendant Baysden was responsible for supervising religious personnel and ensuring compliance with religious policies and directives. (DE 119-10 at 11).

Defendant Grande was executive director of the inmate grievance resolution board, an agency within the DAC, during the relevant period. (Defs' Mem. Ex. 6 (DE 111-21) at 1). Defendant Grande has never met plaintiff and was not personally involved in his custody or control. (Id. at 2). She was not involved in implementing or enforcing any of the religious restrictions at issue in this case and did not supervise correctional staff. (Id.).

In March 2020, North Carolina entered a state of emergency in response to the COVID-19 pandemic. N.C. Exec. Order No. 116, "Declaration of a State of Emergency to Coordinate Response and Protective Actions to Prevent the Spread of COVID-19," (Mar. 10, 2020). Prior to plaintiff's arrival, Tabor CI had suspended in-person, congregate religious services and educational classes in response to COVID-19. (Defs' App. Ex. 2 (DE 111-17) at 2). Educational classes continued through "packets and remote learning." (Id. at 3). Inmates' "religious needs" were "met through private worship." (Id. at 3). Throughout plaintiff's time at Tabor CI, inmates continued their work assignments in the facility's kitchen, warehouse, and laundry services. (DE 119-1 at 8). Plaintiff began working in the kitchen in December 2020. (Id. at 9).

On June 1, 2021, DAC relaunched in-person educational, vocational, and other rehabilitative programs for vaccinated inmates June 1, 2021. (DE 119-1 at 13). Plaintiff was fully vaccinated against COVID-19 in June 2021. (Id. at 12). Using "small, socially distanced groups," Tabor CI resumed in-person educational classes that same month. (DE 111-17 at 3). Faculty from Southeastern Community College led these classes. As state employees, these faculty members were obliged to follow protocols issued by the state related to preventing the spread of COVID-19. (Defs' App. Ex. 1G (DE 111-8) at 53). Plaintiff attended in-person educational classes with other inmates after classes resumed that summer. (DE 119-1 at 12-13).

Unlike educational classes, congregate religious services were led by volunteers. (DE 111-8 at 53). During the relevant period, these volunteers were required to be chaplains, approved religious volunteers, or offender faith helpers.[3] (Defs' App. Ex. 1H (DE 111-9) at 1). Offender faith helpers could only lead congregate religious services when a chaplain or approved religious volunteer was unavailable, and then, only under the supervision of a facility chaplain or designated correctional staff member. (Id. at 2-3). A facility's warden could determine the maximum number of inmates allowed at a congregate religious service facilitated by an offender faith helper "based upon security concerns and operational needs." (Id. at 2).

But offender faith helpers were not permitted to lead all congregate religious services. Rather, they could only lead services for "faith groups." (Id. at 1-2; DE 111-8 at 55). "Faith groups" include religions, like Buddhism, Hinduism, Judaism, Rastafarianism, and Islam. (DE

---

[3] This policy was eliminated by the August 12, 2024, RLUIPA Settlement, under which, "All religious groups with two or more adherents in a facility and within a given security group are afforded the opportunity for group worship and activities." (Plf's Mem. Ex. 15 (DE 119-15) at 2). The RLUIPA settlement expressly prohibits DAC from requiring "an offender faith helper as a prerequisite for any religious group to gather for congregate activities or worship." (Id. at 3).

111-9 at 5; DE 111-8 at 55). According to defendants, Christian services "are historically considered too large to be managed solely by an Offender Faith Helper." (DE 111-17 at 3). As a result, during the relevant period, Christian congregate religious services could only be "facilitated by outside volunteers," and Christian offender faith helpers were not permitted. (DE 111-17 at 3; DE 111-8 at 56).

Consistent with this policy, when plaintiff asked defendant Hovis about "an offender leading Catholic Services," he was told that, "All Christian services must be led by a Community Volunteer." (Plf's App. Ex. 10 (DE 119-10) at 5). Thus, plaintiff's various requests to assist with Roman Catholic or Christian services, serve as a chaplain assistant, and assist as a music minister were denied. (DE 119-1 at 16).

Outside volunteers were allowed to reenter prison facilities statewide beginning in November 2021. (Plf's App. Ex. 7 (DE 119-7) at 3). North Carolina's COVID-19 state of emergency terminated on August 15, 2022. N.C. Exec. Order 267, "Termination of the COVID-19 State of Emergency," (Aug. 15, 2022). That same day, plaintiff filed a grievance requesting that Tabor CI allow outside religious volunteers to return to the facility so that he could receive the Eucharist and sacrament of reconciliation. (Plf's App. Ex. 17 (DE 119-17) at 10). On September 20, 2022, in the step three response to plaintiff's grievance, defendant Grande indicated she had "confirmed with the facility that they are actively re-training volunteers and making definitive steps to reschedule all religious services." (Id. at 7). Plaintiff's grievance was "dismissed as resolved by facility action," and plaintiff was "encouraged to remain patient." (Id.).

In-person congregate religious services resumed at Tabor CI November 15, 2022. (DE 111-17 at 2; Defs' App. Ex. 1M (DE 111-14) at 2). Weekly Christian services, including Roman

Catholic services, resumed in December 2022. (DE 111-14 at 3). On December 6, 2022, plaintiff attended the first Christian religious gathering, a Bible study, held during his time at Tabor CI. (DE 119-1 at 25). But defendant Bailey sent plaintiff back to his cell after the gathering when he learned that plaintiff was a "close custody" inmate. (Id.). At the time, defendant Bailey told plaintiff that close custody inmates were not allowed to attend religious services. (Id.). Plaintiff had been promoted to medium custody three months prior but remained housed in close custody because medium custody bedspace was unavailable. (Id. at 24).

Beginning December 22, 2022, plaintiff was permitted to attend congregate religious services once per month. (Id.; DE 111-8 at 49; DE 111-17 at 4). Plaintiff was eligible to attend a Roman Catholic service in January 2023, but correctional staff refused to allow plaintiff to leave his cell block. (DE 119-1 at 26). On February 6, 2023, plaintiff received the Eucharist for the first time during his custody at Tabor CI. (Id.). He received the Eucharist three times before his transfer to Piedmont CI in March 2023. (Id. at 27). Neither Catholic Mass nor the sacrament of penance were offered during plaintiff's time at Tabor CI. (Id.).

## COURT'S DISCUSSION

A. Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record], if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving

party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).[4]

Only disputes between the parties over facts that might affect a case's outcome preclude summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party). "[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether a genuine issue exists, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam) ("On summary judgment the inferences to be drawn from the underlying facts contained in [the record] must be viewed in the light most favorable to the party opposing the motion.").

But "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin–Williams Co., 681 F.2d 230, 241 (4th Cir. 1982) (cleaned up). "If a reasonable jury could reach only one conclusion based on the evidence or if the verdict in favor of the non-moving party would necessarily be based upon speculation and conjecture, judgment as a matter of law must be entered." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). On

---

[4] Throughout this order, internal citations and quotation marks are omitted from citations unless otherwise specified.

the other hand, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and the court must deny summary judgment. Id. at 489–90.

B. Analysis

1. Individual Involvement in Alleged Constitutional Deprivations

Defendants correctly maintain that "vicarious liability is inapplicable to . . . § 1983 suits." Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009). Instead, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Id. Therefore, the court now considers the extent to which individual defendants were involved in the alleged constitutional deprivations.

As noted above, plaintiff generally alleges defendants violated his constitutional rights through enforcement of three restrictions: 1) disallowing congregate religious services for more than two years in response to COVID-19, while permitting other secular activities to resume; 2) denying plaintiff's requests to become an offender faith helper; and 3) prohibiting plaintiff's weekly participation in congregate religious services once they resumed because of his housing status. For plaintiff to prevail on his constitutional claims stemming from these restrictions, he must show that defendants either individually enforced these restrictions against him or that defendants are individually liable for enforcement of these restrictions under some alternative theory, like supervisory liability.

To proceed under a theory of supervisory liability, plaintiff must show: 1) "the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury"; 2) the supervisor responded so inadequately "as to show deliberate indifference to or tacit authorization of the alleged offensive

practices"; and 3) "there was an affirmative causal link" between the supervisor's inaction and plaintiff's alleged injury. See Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994); see also Wilkins v. Montgomery, 751 F.3d 214, 226 (4th Cir. 2014). "This is not a theory of vicarious liability for the deeds or misdeeds of a subordinate. Rather, the supervisor is found liable for his or her own misconduct." Bolick v. Anderson, 169 F.4th 528, 541 (4th Cir. 2026).

Based on this record, plaintiff has not raised sufficient factual allegations to hold defendant Grande liable for any alleged violation of his constitutional rights. Defendant Grande's involvement in this lawsuit is premised on her response to a grievance filed by plaintiff. Plaintiff contends defendant Grande failed to discuss plaintiff's grievance with him or mediate his grievance as required under DAC policy. But prisoners do not have a "constitutional entitlement or due process interest in access to a grievance procedure" and "cannot bring a § 1983 claim alleging denial of a specific grievance process." Booker v. S.C. Dep't of Corr., 855 F.3d 533, 541 (4th Cir. 2017); see also Jackson v. Sampson, 536 F. App'x 356, 357 (4th Cir. 2013) ("[P]rison officials' failure to follow internal prison policies are not actionable under § 1983 unless the alleged breach of policy rises to the level of a constitutional violation."). Given that defendant Grande was not involved in implementing or enforcing any of the restrictions at issue, had no supervisory role over staff at Tabor CI, and plaintiff has established no other theory by which she might be held liable for his alleged constitutional deprivations, she is entitled to summary judgment on all claims.

As to the remaining defendants, plaintiff has raised sufficient factual allegations to hold defendants Bullard, Bailey, Hovis, and Baysden liable for alleged constitutional violations. As to the first and second restriction, plaintiff has established that defendants Bullard, Bailey, and

Baysden were responsible for implementing or supervising enforcement of these restrictions during the period at issue. Thus, these defendants had actual or constructive knowledge that plaintiff was restricted from attending congregate religious services or serving as an offender faith helper, they did not respond to these deprivations, and that failure to respond affirmatively resulted in plaintiff's ongoing deprivation. See Shaw, 13 F.3d at 799. Defendant Hovis is also liable for enforcing both restrictions against plaintiff.

Finally, plaintiff has established that defendant Bullard was responsible for implementing or supervising enforcement of the third restriction during the period at issue. Defendant Bullard had actual or constructive knowledge that plaintiff was restricted from attending congregate religious services based on his housing status, did not respond to restore plaintiff's access to religious services, and that failure to respond affirmatively resulted in plaintiff's ongoing deprivation. See id. Defendant Bailey is also liable for enforcing the third restriction against plaintiff. But plaintiff has not offered record evidence to suggest defendants Hovis and Baysden were responsible for implementation, supervision, or enforcement of the third restriction. Therefore, plaintiff cannot proceed against these defendants on this theory.

Having established defendants' individual involvement, or lack thereof, in the alleged constitutional deprivations, the court next considers the merits of plaintiff's constitutional claims based on these restrictions.

2. Free Exercise under the First Amendment

The Free Exercise Clause provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. U.S. Const. amend. I. "That restriction applies equally to the States by way of the Fourteenth Amendment." Mahmoud v. Taylor, 606 U.S. 522, 545 (2025). To state

a free exercise claim, a plaintiff must allege that he "holds a sincere religious belief" and "that his religious practice has been substantially burdened by the prison policy or practice." Firewalker-Fields v. Lee, 58 F.4th 104, 114 (4th Cir. 2023); see also Lovelace v. Lee, 472 F.3d 174, 187–88 (4th Cir. 2006). "A substantial burden either puts pressure on a person to change his religious beliefs or puts that person to a choice between abandoning his religion or following his beliefs and losing some government benefit." Firewalker-Fields, 58 F.4th at 114-15; see also Lovelace, 472 F.3d at 187.

Under the first prong of this analysis, the record indicates plaintiff sincerely believes his Roman Catholic faith requires him to attend Mass with other Roman Catholics on Sundays and Holy Days, receive the Eucharist at least once per year, and participate in the sacrament of reconciliation at least once per year. Defendants do not challenge the sincerity of plaintiff's religious beliefs. Turning to the second prong, plaintiff contends defendants substantially burdened his religious exercise by: 1) disallowing congregate religious services for more than two years in response to COVID-19, while permitting other secular activities to resume; 2) denying plaintiff's requests to become an offender faith helper; and 3) prohibiting plaintiff's weekly participation in congregate religious services once they resumed because of his housing status.

Of these restrictions, defendants only challenge the third directly, arguing that "an inmate has no constitutional right to choose his place of incarceration." (Defs' Mem. Opp. (DE 126) at 3). Unlike those cases cited by defendants, plaintiff does not claim a protected liberty interest in prison placement or custody status. See Ajaj v. Smith, 108 F. App'x 743, 744 (4th Cir. 2004) (per curiam); Peterson v. Jackson, 5:15-CT-3308-FL, 2016 WL 1733452, at *2 (E.D.N.C. Apr. 29, 2016); Johnson v. Ozmint, 456 F. Supp. 2d 688, 695-96 (D.S.C. 2006). Rather, plaintiff contends

his religious exercise was substantially burdened when he was denied weekly Mass attendance because of his housing status. For this reason, those cases cited by defendants are inapplicable to the present inquiry.

On this record, disallowing congregate religious services for more than two years (restriction one) and prohibiting plaintiff's Mass attendance after congregate religious services resumed (restriction three) both qualify as substantial burdens under the Free Exercise Clause. See Lovelace, 472 F.3d at 187 (holding substantial burden in RLUIPA context where Muslim inmate was prevented from fasting and group prayer participation during thirty days of Ramadan). While plaintiff also claims his religious practice was burdened by defendants' refusal to allow him to become an offender faith helper (restriction two), it is unclear how that refusal would have impacted his identified sincerely held religious beliefs.

Plaintiff does not suggest he would be eligible to lead Mass, preside over the Eucharist, or administer the sacrament of reconciliation. Plaintiff acknowledges that "there is no alternative or substitute to a priest offering [the sacrament of reconciliation]." (DE 119-1 at 4-5). The Catechism of the Catholic Church, which plaintiff incorporates by reference as an exhibit to his memorandum in support of summary judgment, likewise confirms that only ordained clergy can preside at celebration of the Eucharist and administer the sacrament of reconciliation. Catholic Church, Catechism of the Catholic Church para. 1411, 1461, 1495 (1993), available at https://www.vatican.va/archive/ENG0015/_INDEX.HTM. Thus, plaintiff has not shown how his identified sincerely held religious beliefs were substantially burdened by defendants' refusal to permit his lay leadership of religious services.

Plaintiff's identification of two restrictions burdening his sincerely held religious beliefs, however, does not end the analysis. Once an inmate establishes that a prison policy substantially burdens his ability to practice sincerely held religious beliefs, the court must then determine whether "the free-exercise restriction was reasonably adapted to achieving a legitimate penological objective." Roberts v. Engelke, 180 F.4th 634, 647 (4th Cir. 2026). Courts use the four-factor test established by Turner v. Safley, 482 U.S. 78 (1987), to gauge the reasonableness of a prison regulation:

> (1) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it;
>
> (2) whether there are alternative means of exercising the right that remain open to prison inmates;
>
> (3) the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and
>
> (4) whether there are ready alternatives.

Greenhill v. Clarke, 944 F.3d 243, 253 (4th Cir. 2019) (cleaned up) (citing Turner, 482 U.S. at 89–91). "Applying these factors also requires . . . substantial deference to prison officials." Firewalker-Fields, 58 F.4th at 115. "The difficulties of operating a detention center must not be underestimated by the courts." Id. (quoting Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington, 566 U.S. 318, 326 (2012)).

Under the first factor, a prison regulation must have a "valid, rational connection" to the legitimate government interest put forward to justify it. Turner, 482 U.S. at 89. "[A] regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." Id. at 89-90. "This first factor places a

burden on the prison to put forward the actual interests that support their policies." Firewalker-Fields, 58 F.4th at 116.

Defendants identify several legitimate interests justifying the two restrictions at issue. Generally, they argue that the restrictions "were implemented to safeguard the health, safety and security of the prison population." (Defs' Mem. (113-1) at 20). The government has a legitimate interest in preserving all three. See O'Lone v. Est. of Shabazz, 482 U.S. 342, 350-51 (1987) (recognizing interest in institutional order and security); Bell v. Wolfish, 441 U.S. 520, 547 (1979) (recognizing interest in inmate safety); Fauconier v. Clarke, 966 F.3d 265, 278 (4th Cir. 2020) (recognizing interest in inmate health and welfare).

But the parties dispute whether the restrictions have a "valid, rational connection" to those asserted interests. As to the first restriction, defendants argue that disallowing congregate religious services at the onset of COVID-19 was rationally connected to protecting inmates and staff "[b]ecause so little was known about the COVID-19 virus." (Defs' Mem. (DE 113-1) at 22). They also contend that an ongoing restriction was warranted because "Tabor [CI] continued to experience the effects of COVID-19 well into 2022." (Id. at 24).

Defendants' sworn written testimony suggests that policies were implemented in February 2022 to decrease the prison's "heightened number of COVID-19 cases in close custody." (DE 111-17 at 3). Then, after "COVID-19 cases decreased," Tabor CI trained and certified religious volunteers. (Id. at 2). Volunteer training began by September 20, 2022. Congregate religious services resumed in mid-November 2022. But in-person secular activities, like educational classes, resumed in June 2021.

Plaintiff argues that because secular activities resumed while the ban on congregate religious services was ongoing, defendants cannot show that the first restriction is rationally related to a legitimate penological interest. Here, plaintiff looks directly to Turner for support.

In Turner, the Supreme Court instructed on the importance of inquiring "whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion, without regard to the content of the expression," in determining whether a restriction is rationally connected to a legitimate government interest. 482 U.S. at 90. In arguing that the restriction on congregate religious services was not content-neutral, plaintiff identifies several secular activities that resumed while the religious restriction was ongoing: 1) co-mingling during prison work assignments; 2) cell block socializing; 3) weekly move nights within cell block common areas; and 4) in-person educational classes with outside instructors. But these comparisons ignore a key distinction between congregate religious services and the secular activities identified by plaintiff—religious services were "open to the entire prison population." (DE 111-17 at 3).

Plaintiff contends that defendants "could have resumed religious services under the same COVID safety framework they used in restarting educational classes." (DE 129 at 12). But the court's task is to determine whether the restriction "reasonably relate[s] to some legitimate goal, not whether [it] would make the policy choices differently." Firewalker-Fields, 58 F.4th at 116. Disallowing religious services to prevent the spread of COVID-19 reasonably relates to the legitimate goals of safeguarding inmate health and safety. Still, that does not mean prison officials could invoke the pandemic to justify constitutional deprivations indefinitely.

As the United States Court of Appeals for the Fourth Circuit has recognized, a "proffered penological interest" must "account for the entirety of the challenged period." Hammock v.

Watts, 146 F.4th 349, 366 (4th Cir. 2025). In Hammock, the Fourth Circuit distinguished between a prison's denial of access to religious services during the height of the COVID-19 pandemic and the continued denial of access "for over a year after vaccinations were offered." Id. Without sufficient evidence to support defendants' justification, the Fourth Circuit concluded that it was "left without a penological interest to justify denying [plaintiff's] religious expression . . . after the COVID-19 pandemic." Id. at 367.

As in Hammock, defendants broadly assert continued restrictions on congregate religious services were necessary to prevent the spread of COVID-19. This assertion is not without evidentiary support. Based on defendants' resumption of several secular activities while religious restrictions continued, however, plaintiff argues that defendants "fail to show a reasonable connection between a legitimate COVID-prevention interest (or other safety/security interest) and suspension of religious services." (DE 129 at 6). Thus, whether COVID-19 warranted defendants' restriction on congregate religious services for the entirety of the challenged period, so that it reasonably relates to the legitimate goals of safeguarding inmate health and safety, presents a genuine dispute of material fact. See Anderson, 477 U.S. at 247-48. This precludes summary judgment on the merits of the congregate worship claim. See Hammock, 146 F.4th at 367.

For similar reasons, neither side is entitled to summary judgment on the third restriction. Defendants argue that prohibiting plaintiff's weekly participation in religious services while he was housed in close custody was reasonably related to safeguarding inmate health and safety by "limiting the spread of COVID-19, inmate-on-inmate violence, and violence against staff." (DE 113-1 at 9). According to defendants, in February 2022, Tabor CI began allowing inmates housed

in close custody "out of their cells in groups of 12 for three hour blocks every day" as part of a strategy "aimed at decreasing the heightened number of COVID-19 cases in close custody." (DE 111-17 at 3). "Due to security concerns, the rotating schedules for offenders, staffing, and volunteer availability, offenders in close custody were permitted to attend their weekly religious services once a month." (Id. at 4).

Plaintiff argues this restriction is not rationally related to the stated interest for two reasons. First, plaintiff contends that, as a medium custody inmate housed in close custody, he should not have been treated as a close custody inmate for purposes of religious service attendance. Here, plaintiff raises doubts about defendants' compliance with prison policy when they seemingly failed to obtain necessary approvals to keep him in close custody housing following his promotion to medium custody. But, as noted above, the failure to follow internal prison policy generally does not establish a constitutional violation. See Riccio, 907 F.2d at 1469; Jackson, 536 F. App'x at 357. Beyond this, plaintiff offers several policy alternatives and argues that defendants gave "no reason" why those policies were not implemented instead. Yet choosing between policy options is not the task at this stage in the analysis.

Next, plaintiff argues this restriction was implemented as a "punitive tool" to incentivize close custody inmates' promotion to medium custody status. (DE 129 at 17). Plaintiff bases his argument on remarks made by defendant Bullard at a January 26, 2023, meeting, nearly a year after the restriction went into effect. At that meeting, defendant Bullard acknowledged intentionally "mak[ing] it hard" for close custody inmates to encourage their promotion to medium custody. (Id.). But this single, out-of-context statement does not bring plaintiff's punitive theory within the range of reasonable probability. See Lovelace, 681 F.2d at 241.

Because plaintiff was a medium custody inmate housed in close custody, it is unclear how defendants' proffered justifications of limiting inmate-on-inmate violence and violence against staff among members of the close custody population apply to plaintiff. Nothing in the record suggests similar restrictions existed for inmates housed in medium custody. But to the extent close custody inmates were experiencing a "heightened number" of COVID-19 cases, restricting plaintiff's attendance at congregate religious services while he was housed in close custody has a valid, rational connection to the identified interests of safeguarding inmate health and safety by limiting the spread of COVID-19. Once again, however, whether COVID-19 warranted this restriction for the duration of the challenged period remains contested. See Anderson, 477 U.S. at 247-48. As such, this genuine dispute of material fact precludes summary judgment on the merits. See Hammock, 146 F.4th at 367.

3. Establishment of Religion under the First Amendment

The Establishment Clause states that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. This clause "mandates government neutrality between religions." Cath. Charities Bureau, Inc. v. Wisc. Lab. & Indus. Rev. Comm'n, 605 U.S. 238, 241 (2025). Put another way, "a policy may not confer a privileged status on any particular religious sect, nor may it single out any bona fide faith for disadvantageous treatment." Roberts, 180 F.4th at 648 (cleaned up). This requires "proving both a set of facts, like in all litigation, and proving that those facts align with a historically disfavored establishmentarian practice." Id. "An analysis focused on original meaning and history . . . has long represented the rule rather than some exception within the Court's Establishment Clause jurisprudence." Kennedy v. Bremerton Sch. Dist., 597 U.S. 507, 536 (2022) (cleaned up).

Plaintiff argues defendants violated the Establishment Clause in two ways. First, plaintiff argues that "minority faiths" could "meet through the work of an inmate faith helper," while plaintiff "was denied the ability to serve as an inmate faith helper for Catholics." (DE 117 at 23). As a result, plaintiff contends, defendants "all but curtailed any ability of Catholic inmates to fulfill and adhere to the tenets of their religion" during the years congregate religious services were disallowed at the prison. (Id.). Next, he contends defendants "accommodated certain religious sects (Muslims for Ramadan, Jews for Seder, and Native Americans for Green Corn festival) but not Christians and Catholics." (Id. at 23). Defendants acknowledge accommodating the dietary requirements of certain religious groups but argue that these accommodations have no bearing on plaintiff's access to congregate religious services.

As discussed above in the court's free exercise analysis, plaintiff argues defendants might have resumed religious services well before November 2022 under accommodations like those made for secular programs. They failed to do so. But Christians, and Catholics specifically, were not the only religious groups precluded from gathering for congregate religious services. According to Tabor CI's religious services calendar, congregate religious services resumed November 15, 2022. Catholic religious services resumed December 6, 2022. The first congregate, non-denominational Christian religious service took place December 11, 2022. Thus, this prohibition extended to all religious groups at the prison during the same period, regardless of whether those groups used offender faith helpers to facilitate religious services. Because no religious groups received privileged status or disadvantageous treatment during the period at issue, this theory fails.

To the extent plaintiff seeks to prove defendants' accommodation of dietary requirements for certain religious groups violated his rights under the Establishment Clause, he must show how those accommodations "align with a historically disfavored establishmentarian practice." Roberts, 180 F.4th at 648. Plaintiff makes no such showing. Plaintiff's only historical argument is a passing reference to three cases intended to show that "[p]risons are subject to the restrictions of the Establishment Clause." (DE 117 at 22). "[M]odern Establishment Clause jurisprudence demands far more." See Roberts, 180 F.4th at 648. Plaintiff has not mustered historical evidence supporting his Establishment Clause claim, so it fails on this theory as well. See id. Since plaintiff has not made a prima facie showing for his Establishment Clause claim, defendants are entitled to summary judgment.

4. Equal Protection under the Fourteenth Amendment

Under the Equal Protection Clause of the Fourteenth Amendment, "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. That clause "does not take from the States all power of classification but keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001) (cleaned up). "To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." Id. After making this showing, "the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." Id. Here, as with plaintiff's free exercise claim, the restriction stands under Turner if "justified by legitimate penological interests." Id. at 657.

According to plaintiff, three restrictions implemented by the prison: 1) disallowing congregate religious services for more than two years in response to COVID-19; 2) denying plaintiff's requests to become an offender faith helper; and 3) prohibiting plaintiff's weekly participation in congregate religious services once they resumed because of his housing status, resulted in plaintiff being treated "differently from other similarly situated inmates on the basis of his religious expression." (DE 117 at 20). Each restriction is addressed in turn.

Under the first restriction, plaintiff argues that "inmates who wish to engage in congregate religious expression" were treated "differently from inmates who wish to engage in purely secular congregate expression." (Id. at 20-21). Plaintiff contends he was treated differently and that this different treatment was intentional. But he fails to show that discrimination against Christians, Roman Catholics, or any religious group, caused this unequal treatment. See Sylvia Dev. Corp. v. Clavert Cnty., Md., 48 F.3d 810, 821 (4th Cir. 1995) ("[W]e must determine whether . . . [defendant] denied [plaintiff's] application *because* [plaintiff] was a Czech immigrant. . . . [T]he use of the classification must be clear and intentional.") (emphasis added); see also Burke v. Clarke, 842 F. App'x 828, 838 (4th Cir. 2021). "Proof of . . . discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265 (1977).

As has been discussed at length, congregate religious services at Tabor CI were "open to all inmates." (DE 111-17 at 3). Those secular activities identified by plaintiff, including educational classes, work assignments, and even movie nights, were not. Because plaintiff has not shown a "clear pattern" of discriminatory behavior, "unexplainable on grounds other than" the suspect classification or otherwise provided evidence to suggest discriminatory intent, his claim

under this restriction fails. See Village of Arlington Heights, 429 U.S. at 266; Burke, 842 F. App'x at 838.

Next, plaintiff argues the second restriction "prohibited him from acting as a faith helper to the Catholic faith, while other minority (non-Catholic and non-Christian) faiths were eligible for inmate faith helpers."[5] (DE 117 at 20). Defendants argue that plaintiff was ineligible to become an offender faith helper because Christian religious services, which are open to the entire prison population, "are often considered too large to be safely managed solely by an Inmate Faith Helper." (DE 113-1 at 8, 27). But service size is directly addressed under the applicable faith helper policy, which states that a prison's warden can set "the maximum number of member Offenders who shall be allowed to attend religious services which are facilitated by Offender Faith Helpers." (D.E. 111-9 at 2).

Contrary to defendants' asserted rationale, plaintiff contends he was not eligible to become an offender faith helper because, as a Roman Catholic, he is not part of a minority "faith group." According to sworn testimony, during the relevant period, offender faith helpers were only available for those religions identified as minority faith groups. (DE 111-8 at 55-56). As part of the "Christian faith," Roman Catholics were not included in that group. (Id.). Thus, there were no Christian offender faith helpers during plaintiff's time at Tabor CI. (Id.).

Defendants acknowledge this distinction, noting that offender faith helper positions "are designed to lead services for faith groups, not faith group denominations." (Defs' Statement of Material Facts (DE 114-1) at 6). Defendants imply that Roman Catholics are a "faith group

[5] This presentation differs from plaintiff's establishment claim, which plaintiff based on defendants "curtail[ing] any ability of Catholic inmates to fulfill and adhere to the tenets of their religion" during a time when no religious groups were permitted to gather for religious services. (DE 117 at 23).

denomination," not a "faith group." Nowhere do defendants define "faith group denomination," and the faith helper policy cited to support the distinction does not contain the term. The faith helper policy does provide a list of approved "offender faith helper codes," and requires that offender faith helpers "be assigned to the prospective code corresponding to the specific faith group listed below." (DE 111-9 at 5). No Christian faiths are assigned a faith helper code. (Id.). DAC no longer requires "an offender faith helper as a prerequisite for any religious group to gather for congregate activities or worship." (Plf's Mem. Ex. 15 (DE 119-15) at 3).

On its face, the second restriction does not operate in a neutral fashion but applies based on an inmate's religious beliefs. See Turner, 482 U.S. at 89-90. Defendants do not dispute that the restriction excluded plaintiff from becoming an offender faith helper, and plaintiff was expressly told that Christian religious services must be led by a community volunteer, rather than an inmate. Based on this record, there is conflicting evidence as to whether plaintiff was prevented from becoming an offender faith helper due to security concerns over the size of Christian religious services, or whether plaintiff, as a Roman Catholic, was ipso facto ineligible for the role. In the latter case, such a restriction would not have a valid, rational connection to the identified interest of inmate safety and security. See Turner, 482 U.S. at 89-90. This genuine dispute of material fact precludes summary judgment on this claim. See Anderson, 477 U.S. at 247-48.

Finally, plaintiff argues the third restriction "treated medium-custody inmates housed in close custody quarters differently for purposes of attending religious services from medium-custody inmates generally." (DE 117 at 21). But plaintiff was not similarly situated to inmates housed in medium custody. Rather, plaintiff remained housed in close custody after his

promotion to medium custody because no medium custody bedspace was available. According to defendants, inmates housed in close custody were allowed "out of their cells in groups of 12 for three hour blocks every day" as part of a strategy "aimed at decreasing the heightened number of COVID-19 cases in close custody." (DE 111-17 at 3). Like other inmates housed in close custody, plaintiff acknowledges that he was only able to attend religious services once per month. Therefore, plaintiff was not subject to disparate treatment when compared with similarly situated inmates housed in close custody.

But even if plaintiff could establish that inmates housed in medium custody are the proper group for comparison, he fails to show that his different treatment resulted from intentional or purposeful discrimination. As detailed above, plaintiff's theory rests on a single remark made by defendant Bullard at a January 26, 2023, meeting where he acknowledged "mak[ing] it hard" for close custody inmates to encourage their promotion. (DE 117 at 22). On this record, plaintiff has not marshalled sufficient evidence to show, by a reasonable probability, that defendants acted with discriminatory motive in prohibiting his weekly participation in congregate religious services. See Lovelace, 681 F.2d at 241. For these reasons, defendants are entitled to summary judgment on this theory. See Morrison, 239 F.3d at 657.

5. Qualified Immunity

Qualified immunity protects government officials performing discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Iko v. Shreve, 535 F.3d 225, 237 (4th Cir. 2008). The qualified immunity analysis proceeds in two steps, which the court "may address in whichever sequence will best facilitate the fair and efficient disposition of

the case." Pfaller v. Amonette, 55 F.4th 436, 444 (4th Cir. 2022) (cleaned up). First, plaintiff must establish the violation of a constitutional right. Id. Second, defendants bear the burden of showing the right at issue was not "clearly established" at the time of the alleged misconduct. Pearson v. Callahan, 555 U.S. 223, 232 (2009).

Officials' actions violate clearly established rights only if their unlawfulness is apparent under preexisting law. Iko, 535 F.3d at 237–38. Under this standard, officials must show only the legal knowledge of an objectively reasonable official in similar circumstances. Id. at 238. Officials are liable for transgressing "bright lines," not for "bad guesses in gray areas." Id. To determine whether the right in question was clearly established, the court looks to cases from the Supreme Court, the Fourth Circuit, or the highest court of the state in which the action arose. Owens ex rel. Owens v. Lott, 372 F.3d 267, 279-80 (4th Cir. 2004). Although an identical case is not required, "existing precedent must have placed the . . . constitutional question beyond debate." Kisela v. Hughes, 584 U.S. 100, 104 (2018). "In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." Id.

First, the court considers the first and third restrictions. The court begins with the second prong of the qualified immunity analysis—whether plaintiff's alleged constitutional rights were clearly established. As detailed above, plaintiff contends defendants violated his right to free exercise under the First and Fourteenth Amendments by disallowing congregate religious services for more than two years and prohibiting plaintiff's weekly participation once services resumed because of his housing status.

Few factual scenarios have created more opportunity for "bad guesses in grey areas" than the COVID-19 pandemic. See Iko, 535 F.3d at 237–38. As defendants acknowledge, "the

pandemic was a unique experience in modern life for all involved, especially those seeking to operate prison facilities where the health and safety of those in their custody and those who worked in the facility [were] at risk." (DE 113-1 at 30). Plaintiff has not identified a case holding that depriving inmates of congregate worship services during the COVID-19 pandemic, to safeguard the health, safety, and security of the prison population, violated the Free Exercise Clause. See Iko, 535 F.3d at 237–38. Neither has the court found a case that would suggest this question is "beyond debate." Kisela, 584 U.S. at 104. Under these circumstances, it would not have been clear to every objectively reasonable prison official that the conduct was unlawful. Id. But prison officials could not invoke the pandemic to justify constitutional deprivations indefinitely.

The parties dispute whether these restrictions have a "valid, rational connection" to the stated interests of safeguarding inmate health and safety for the entirety of the challenged period. Whether COVID-19 warranted defendants' restrictions for the entirety of the challenged period, so that they reasonably relate to the legitimate goals of safeguarding inmate health and safety, presents a genuine dispute of material fact. See Anderson, 477 U.S. at 247-48. Should a factfinder determine that COVID-19 does not justify these restrictions for the duration of the challenged period, then the restrictions would not relate to any legitimate penological interest. See Hammock, 146 F.4th at 367-68. Under those circumstances, defendants would not be entitled to qualified immunity. Id. ("One would be hard-pressed to find a more clearly established constitutional violation" than denying a plaintiff's right to free exercise "without any legitimate penological interest."). Therefore, defendants are not currently entitled to qualified immunity on plaintiff's free exercise claim relating to the first and third restrictions.

Next, the court considers the second restriction. The court again begins with the second prong of the qualified immunity analysis. Though applied during the COVID-19 pandemic, defendants do not attempt to justify this restriction on account of the pandemic. According to prison policy, inmates could serve as "offender faith helpers." But this privilege was only available to members of particular "faith groups." As detailed above, Christians, including Roman Catholics, were excluded from serving as offender faith helpers.

The constitution prohibits state actors from preferring one religious sect over another. See Larson v. Valente, 456 U.S. 228, 244-46 (1982) (describing bar on denominational discrimination under the Establishment Clause). While disparate treatment based on a protected classification is not categorically impermissible in the prison context, it must be justified by a legitimate penological interest. See Morrison, 239 F.3d at 657 (addressing equal protection claim in the context of racial discrimination); see also Coleman v. Sergeant Jones, No. 20-7382, slip op. at 16 (4th Cir. June 17, 2022), https://www.ca4.uscourts.gov/opinions/207382.u.pdf ("[I]t has been clearly established since well before 2018, when the events at issue here occurred, that intentional or purposeful discrimination based on religion, if not sufficiently justified, violates the Equal Protection Clause."). A genuine dispute of material fact exists as to whether this policy was justified by safety and security concerns relating to the size of Christian congregate religious services, or whether Christians, and Roman Catholics specifically, were ipso facto excluded from serving as offender faith helpers on account of their religious beliefs. See Anderson, 477 U.S. at 247-48. Given that the restriction would not be related to a legitimate government interest in the latter case, defendants are not currently entitled to qualified immunity on plaintiff's equal protection claim relating to the second restriction.

6. Motion to Seal

Finally, defendants move to seal plaintiff's medical records, an educational course agreement with nonparties, and portions of defendants' memorandum referencing plaintiff's medical records. The court has reviewed and considered the motion under the governing standard. Doe v. Pub. Citizen, 749 F.3d 246, 266–67, 272 (4th Cir. 2014). Plaintiff does not oppose sealing these records and portions of defendants' memorandum in support of summary judgment referencing the same, and the public has received adequate notice of the motion to seal. Plaintiff's interest in the confidentiality of his medical records and the prison's interest in preserving the confidentiality of its contractual agreements with nonparties require sealing in the instant case. Therefore, defendants' unopposed motion to seal (DE 115) is granted and the clerk shall maintain docket entries 112, 113, and 114 under seal.

**CONCLUSION**

Based on the foregoing, the parties' motions for summary judgment and unopposed motion to seal are resolved as follows:

1) Defendants' motion for summary judgment (DE 108) is:
    a. GRANTED on all claims against defendant Grande;
    b. GRANTED on plaintiff's Establishment Clause claim under the First Amendment;
    c. DENIED on all other claims.
2) Plaintiff's motion for summary judgment (DE 116) is DENIED on all claims.
3) Defendants' unopposed motion to seal (DE 115) is GRANTED. The clerk is DIRECTED to maintain docket entries 112, 113, and 114 under seal.

Before entering a trial scheduling order, the court requires that the parties participate in a court-hosted settlement conference. Accordingly, under Local Alternative Dispute Rule 101.1, EDNC, this case is REFERRED to United States Magistrate Judge Robert B. Jones, Jr. for a court-hosted settlement conference, for the purpose of resolving all remaining issues in dispute. The magistrate judge will notify the parties how he wishes to proceed. In the event the parties do not reach a resolution to this action, further order regarding trial planning and scheduling will follow.

SO ORDERED, this the 25th day of September, 2026.

LOUISE W. FLANAGAN
United States District Judge